# Staunton.

## CROSSWHITE V. BARNES AND WITT V. BARNES.

September 18, 1924.

Absent, Campbell, J.

1. ASSAULT AND BATTERY—*What Constitutes ·Battery—Slightest Touching of Another.*—The slightest touching of another, or of his clothes, or cane, or anything else attached to his person, if done in a rude, insolent, or angry manner, constitutes a battery for which the law affords redress.

2. ARREST—*Arrest without Warrant—Felony.*—A felony is so serious a violation of law that an officer may, without a warrant, arrest one on reasonable suspicion of his having committed a felony, and he will be protected even though no felony has been committed, if he had reasonable ground for his belief.

3. ARREST—*Arrest without Warrant—Misdemeanor—Officer must have Warrant with Him.*—It is necessary before an arrest for a past misdemeanor not only that a warrant of arrest should have been issued, but that the officer making the arrest shall have it with him and show it on request.

4. PUBLIC OFFICERS—*Resistance of Authority—Reckless Conduct on the Part of the Officer.*—Public officers duly equipped with the authority of the law represent the majesty of the law, and to them, when so equipped, every good and true citizen should yield prompt and willing obedience, and they should be accorded the fullest protection in the discharge of their duties. But nothing can so militate against the effective administration of justice and the proper regard for the law of the land as unlawful and reckless conduct on the part of officers who are charged with its enforcement.

5. ARREST—*Infliction of Serious Bodily Harm on One Fleeing from Arrest for a Misdemeanor.*—An officer seeking to arrest one who is simply fleeing from arrest for a misdemeanor has no right to inflict serious· bodily harm upon the fugitive.

6. ARREST—*Warrant Addressed to one Officer—Execution by Another.*—A warrant addressed to one officer may be executed by another if it has been delivered to him for that purpose.

7. ARREST—*Illegal Arrest—Assault and Battery—False Imprisonment—Mitigation of Damages—Conduct of Plaintiff.*—In an action for illegal ar-

rest and assault and battery the trial court refused to permit the defendant to introduce in mitigation of damages, "the conduct and language of the plaintiff which caused the criminal warrant to be issued for her arrest."

*Held:*   That this was no error as the arresting officers had nothing to do with what transpired before the warrant was issued.

8.   ARREST—*Illegal Arrest—Assault and Battery—False Imprisonment—Evidence—Judgment of Conviction.*—In an action for illegal arrest and assault and battery it appeared that the plaintiff was served with a warrant charging her with resisting an officer and was fined $10.00. She was also tried on the original warrant under which the arrest was made, and fined $50.00.   The defendant offered in evidence the warrants, and the judgments thereon, to show the good faith of the officers and also in mitigation of damages.   The trial court admitted in evidence the warrant for the arrest of the plaintiff, but refused to admit the judgment on that warrant, or the warrant and judgment in the case for resisting an officer.   Damages were not claimed for anything that transpired after the time of the arrest nor were punitive damages claimed.

 *Held:*   That there was no error in the action of the trial court.

9.   ARREST—*False Imprisonment—Malice—Good Faith.*—In the instant case, an action for assault and battery and illegal arrest, defendants were sued for a wrongful arrest and detention under very aggravating circumstances. Neither malice, ill will, nor the slightest wrongful intention on the part of the defendants was necessary to maintain the action. Good faith on the part of one making a wrongful arrest is no answer to a claim for the actual damages sustained in consequence thereof.

10.   ARGUMENT OF COUNSEL—*Assault and Battery—Harmless Error.*—In an action for illegal arrest and assault and battery counsel for the plaintiff said to the jury, "what would you have your wife treated that way for?"   Counsel for the defendant asked the trial court to "disregard the same as improper argument, but the court refused to do so," and the defendant excepted.

 *Held:*   That while the request of counsel for the defendant should have been granted, yet as the amount of the verdict did not indicate that the argument of plaintiff's counsel seriously affected the result, the error was not of sufficient importance to justify a reversal.

11.   ARREST—*Assault and Battery—New Trial—Damages Held not Excessive.*—Where defendant was sued for the wrongful arrest and detention of a woman under very aggravated circumstances, a verdict for $500.00 could not be said to be excessive.

Error to a judgment of the Circuit Court of Washington county, in an action of trespass. Judgment for plaintiff. Defendants assign error.

*Affirmed.*

The opinion states the case.

*George M. Warren* and *D. T. Stant*, for the plaintiffs in error.

*L. P. Summers* and *H. E. Widener*, for the defendant in error.

BURKS, J., delivered the opinion of the court.

By consent of parties, these two cases were heard at the same time in the trial court, and the same verdict and judgment were entered in each. By similar consent, they are likewise heard in this court, and only one record has been presented and printed. In each case there was a verdict and judgment for the plaintiff for $500.00.

A warrant for the arrest of Mrs. Effie Barnes, for a misdemeanor, had been issued by the police justice of the city of Bristol, Virginia, and placed in the hands of W. T. Crosswhite, chief of police of the city, for execution. The center of State street in said city is the dividing line between the States of Virginia and Tennessee. Mrs. Barnes lived on the Tennessee side of the city.

On July 6, 1923, Crosswhite and city sergeant J. D. Witt (the defendants in trial court), set out to execute this warrant. Crosswhite had on his uniform of policeman, and Witt was dressed in plain clothes. Cross-

white, to whom the warrant of arrest was addressed, left the warrant in his desk at the courthouse. When the officers first saw Mrs. Barnes, she was driving down State street, on the Virginia side, in her automobile, in which she had four young children and a lady companion; the ages of the children ranging from twelve years down.

There is serious conflict in the testimony as to what then took place, but there was abundant evidence to support the instruction of the court which is the chief controversy between the parties.

Mrs. Barnes' account of what took place was as follows: "On the day of this occurrence I was out driving my car, with my four little children with me, the oldest being twelve years old. I had done some shopping in Bristol and was driving down the north side of State street, on the Virginia side, at a moderate speed, when an automobile turned into the curbing right ahead of me. I did not know Mr. Witt, but knew Mr. Crosswhite was a policeman, at the time, but a man whom I afterwards found out to be Mr. John D. Witt got out of the car and came to my car door and opened the door and took hold of me by the arm and said get in my car. I refused to go and told him I would not go anywhere without my man (meaning my husband), and he said: 'We don't want your man, we want you, and you are going.' Mr. Crosswhite had come up in the meantime and I asked him to show me his warrant, and he said he did not have to do so, and that 'you are going to the courthouse.' Mr. Crosswhite got on the running board of the car and I started the car down State street from King street to Commonwealth avenue, which is one block, and when I got to Commonwealth avenue I started to turn the car to the south side of the street and go to my husband's store where he was working, which

is in Tennessee, but he (Mr. Crosswhite) took hold of
the steering wheel and steered my car into Common-
wealth avenue, and said: 'You are going to the court-
house.'   I said: 'I am not going anywhere without my
man (meaning my husband).'   Mr. Crosswhite then
told Miss Bell, who was seated in the front seat of the
car with me, to get out of my car, and I held her and
told her not to get out, and then Mr. Crosswhite climbed
into the front seat of my car and sat on Miss Bell's lap,
and he told Mr. Witt to get in the car and drive us to
the courthouse and Mr. Witt got into the car and tried
to run it, but could not start it, and got out.   Then Mr.
Crosswhite asked a man by the name of Shettle, who
was working on the street, to get in my car and drive it.
Shettle, a man whom I had never seen before, got into
my car, pushed me out of the way and over on Cross-
white, and tried to drive the car, but every time he
would start the engine I would shut it off.   I refused to
allow any of them to drive my car.   Mr. Crosswhite
tried to pull me loose from the steering wheel and the
steering geer, and in doing so he put his arms around my
shoulders and pulled me.   He took hold of my leg and
left a very large bruise on it.   He, in his efforts to take
me out of the car, exposed my person.   Finally, some
one suggested that I send for my husband, who was just
two blocks away at his place of business, and my oldest
child, a little girl, ran to her father's place of business
and in a few minutes my husband appeared, and when
Mr. Crosswhite saw him coming he got out of the car
and we then drove around to the Virginia courthouse.

"In this scuffle Mr. Crosswhite took me by the wrist
and almost broke my arm, and did break my wrist
watch, and when I told him what he had done he said he
did not care anything about my watch.   He had me
around the neck and a hold of me as near all over as I

can tell you.  I told him that I would die before I would go to the courthouse without my husband, and he said: 'You will die then.' I heard Mr. A. D. L. Short ask him the question where my husband was, and Mr. John D. Witt said to him: 'To hell with her husband, we want her.'  After I sent my little daughter for my husband, then it was for the first time that Mr. Crosswhite agreed to allow me to telephone for my husband."

Mrs. Barnes further testified that the reason she refused to go with the officer was that she "did not know what it was all about, and that she asked Mr. Crosswhite, at King street, to show her his warrant, and he said he did not have to do so, but that she had to go with him to the courthouse.  When her husband came up, he got into the car and drove it to the courthouse, where Mrs. Barnes was released on bail.

At the subsequent trial of Mrs. Barnes on the warrant issued against her, she was convicted and fined $50.00.  She was also fined $10.00 for resisting an officer.

After the termination of these proceedings, Mrs. Barnes brought separate actions against Crosswhite and Witt for illegal arrest and for assault and battery, in which were rendered the judgments herein complained of.

There were several minor objections to the rulings of the trial court in reference to the time and manner of giving the instructions, as well as to their phraseology, but the real fight was over the correctness of the following instruction, given at the instance of the plaintiff, Mrs. Barnes:

"The court instructs the jury that as a matter of law an officer has no right to make an arrest for a misdemeanor without a warrant, which warrant he must have with him at the time he attempts to make the arrest,

unless it be for a misdemeanor committed in the presence of the officer, and the court tells the jury that if, in this case, they believe from the evidence that the defendants attempted to arrest the plaintiff charged with a misdemeanor, and that at the time of said attempt to arrest her they did not have a warrant for the plaintiff in their possession, then the court tells the jury that their action was unlawful and they were without authority to interfere or molest the plaintiff in any way; the court further tells the jury that the warrant for the arrest of the plaintiff only charged her with a misdemeanor."

The powers and duties of an officer making an arrest for a past misdemeanor have been frequently the subject of discussion by the courts, but they have not always reached the same conclusion.

In many of the cases the preservation of the liberty of the citizen and the sanctity of his person are regarded as essential to the safety and well being of society, while others hold that that end will best be attained by according to officers the fullest protection in the discharge of their duties, and requiring the citizen to take notice of their insignia of office and presume, at least *prima facie*, that they will not exceed their powers.

[1] The law is so jealous of the sanctity of the person that the slightest touching of another, or of his clothes, or cane, or anything else attached to his person, if done in a rude, insolent or angry manner, constitutes a battery for which the law affords redress.  2 Bish. New Criminal Law, section 72.  An officer, therefore, who would justify laying hands on a person for the purpose of making an arrest, must come protected by the shield provided by law.

[2, 3] A felony is so serious a violation of law that an officer may, without a warrant, arrest one on reasonable

suspicion of his having committed a felony, and he will be protected even though no felony has been committed, if he had reasonable ground for his belief. Beale's Crim. Pl. & Pr., section 20. Not so, however, of a past misdemeanor. The textbooks generally state, and many cases hold, that it is necessary not only that a warrant of arrest should have been issued, but that the officer making the arrest shall have it with him and show it on request. In Beale's Crim. Pl. & Pr., section 18, it is said: "An officer arresting on a warrant must have the warrant with him, and must show it on request." In 1 Bish. New Crim. Pro., section 190, it is said: "To justify an arrest under a warrant, the officer must have it in possession; as, if though delivered to him, he leaves it at his office or station house, it will not protect him." In 2 R. C. L. 465, section 23, speaking of misdemeanors not committed in the presence of the officer, it is said: "The officer should have the warrant in his actual possession in order to justify the arrest, and if he does not have it, although it has been duly issued, an officer making an arrest may not be protected by it." In 3 Cyc. 876, it is said, the officer, in a case of this kind, has no "right to make an arrest unless he has the warrant with him at the time, even though the person arrested knows that a warrant has been issued." In the annotator's summary of a note in 42 L. R. A., at page 682, it is said: "An accused person, if he demand it, is entitled to have the warrant for his arrest showed to him at the time of his arrest." See also 51 L. R. A. 211. Each of these text writers give the cases relied on to support the text, but we have deemed it sufficient to cite the texts only, as we rely upon our own cases as settling the question in this State.

It must be conceded, however, that, as to the necessity of showing the warrant, there is much weighty au-

thority to the contrary.    In 1 Bish. New Crim. Proc.,
section 191, it is said:

"Private persons, and officers out of their precincts,
to whom warrants are specially directed, 'and even offi-
cers if they be not sworn and commonly known,' must,
as expressed by Hawkins, 'show their warrant if de-
manded.'    Known and sworn officers, within their pre-
cincts, need not do this; yet they 'ought to acquaint the
party with the substance of their warrants.'    This lib-
erty of the known officer has been pointed out by Lord
Kenyon as a 'most dangerous doctrine; since no one
should be required to take another's mere word in such
a matter.'    But something ought to be allowed to offi-
cial position; and if one publicly known to be an officer
of the precinct undertakes to arrest another under the
claim, thereby implied, that he has a warrant in due
form, the other ought to yield sufficiently to furnish op-
portunity for calmly looking into the question.    Hence,
the arrest, the explanation, and the reading of the war-
rant when demanded, 'are obviously successive steps.
They cannot all occur at the same instant of time.'    And
in the case of a known officer, 'the explanation must fol-
low the arrest;' and the exhibition and perusal of the
warrant must come after the authority of the officer has
been acknowledged, and his power over his prisoner ac-
quiesced in."

After citing authorities, the author says in a note:
"Such may be deemed the American doctrine."

In 3 Cyc. 896, it is said:    "In making an arrest, a
sworn peace officer, commonly known as such and act-
ing within the limits of his jurisdiction, is not bound to
show his warrant, even though it is demanded of him, as
every one is bound to know the character of such officer
when acting within his proper jurisdiction, and is bound
to submit peaceably to the arrest, before he can de-

·mand that the cause be made known to him. After the person has submitted to the arrest or acquiesced in the authority of the officer, however, the latter should, if demanded, acquaint the former with the cause of the arrest, either by stating the substance of the warrant to him, or by reading it to him; but when the officer is resisted and there is danger of the prisoner's escape, it seems that he is not bound to exhibit his warrant."

See also *Maughon* v. *State*, 7 Ga. App. 660, 67 S. E. 842; *State* v. *Shaw*, 104 S. C. 359, 89 S. E. 322; *Cabell* v. *Arnold*, 86 Tex. 102, 23 S. W. 645, 22 L. R. A. 87; *Giddens* v. *State*, 154 Ga. 54, 113 S. E. 386.

[4] Public officers duly equipped with the authority of the law represent the majesty of the law, and to them, when so equipped, every good and true citizen should yield prompt and willing obedience, and they should be accorded the fullest protection in the discharge of their duties. But "nothing can so militate against the efficient administration of justice and the proper regard for the law of the land as unlawful and reckless conduct on the part of officers who are charged with its enforcement." *Bourne* v. *Richardson*, 133 Va. 441, 113 S. E. 893.

[5] It is outside of the point involved in this case to discuss the rights of an officer seeking to arrest one who is simply fleeing from arrest for a misdemeanor, but we so frequently read in the press of acts of violence by officers in such cases that it is deemed proper to say that such officers have no right to inflict serious bodily harm upon one who is simply fleeing arrest for a misdemeanor.

·· As said by the Supreme Court of Arkansas in *Thomas* v. *Kinkead*, 55 Ark. 502, 18 S. W. 854, 15 L. R. A. 558, 29 Am. St. Rep. 68, the law making power itself cannot inflict the death penalty as a punishment for a simple misdemeanor, and it would ill become the majesty of the

law to sacrifice human life, or to subject a party to serious bodily harm to avoid the failure of justice in the case of a petty offender who is often brought into court without arrest and dismissed with a nominal fine.   The tendency of the decisions is in the same direction.   See *Brown* v. *Weaver*, 76 Miss. 7, 23 So. 388, 42 L. R. A. 423, 71 Am. St. Rep. 512; *Handley* v. *State*, 96 Ala. 48, 11 So. 322, 38 Am. St. Rep. 81; Beale's Crm. Pl. & Pr., section 26, and cases cited.

The execution of a warrant of arrest for a past misdemeanor is not the exercise of a discretionary power, and an officer executing it can only claim the protection of the law when he himself is acting pursuant to law.   His powers are well defined, and he should keep within them.   So long as he does so, he is entitled to the fullest protection the law can afford, but the law affords no protection to an officer while violating a law he has sworn to support.   Such is and has been the view taken by this court.

In *Muscoe's Case*, 86 Va. 443, 10 S. E. 534, a policeman undertook to arrest Muscoe for a past misdemeanor, without a warrant, and Muscoe shot and killed him. He was convicted of murder of the first degree and appealed to this court.   In the course of the opinion by Lewis, P., it was said:   "In general, in cases of misdemeanor, a constable or other peace officer cannot, any more than a private person, justify the arrest of the offender without a warrant, when the offense was not committed in his presence.   2 Hawk. P. C., chapter 13; 1 Chit. Crim. Law, 20; 1 Bishop Crim. Pro. (3d ed.), section 181; 7 Am. & Eng. Ency. of Law, page 675; *Id.* page 734; 1 Dill. Mun. Corp. (3d ed.), section 210, and cases cited.

"Indeed, not only must there be a warrant in the class of cases last mentioned, but, to justify the arrest,

the officer must have the warrant with him at the time. *Gilliard* v. *Laxton*, 2 B. & S. 363 (110 Eng. C. L. 363); *Regina* v. *Chapman*, 12 Cox, C. C. 4."

It is true that the last sentence in the above quotation was not necessary to the decision of the case, but it is supported by a number of cases. The first paragraph, however, was essential, as it went to the right of the policeman to make the arrest. It was held that the presence of a warrant was essential to confer power on the policeman to make the arrest. The holding in *Muscoe's Case* was approved by this court in *Hill* v. *Smith*, 107 Va. 848, 59 S. E. 475, where the defendant was committed to jail for ten days as a "suspicious character," and was discharged on a writ of *habeas corpus*. The case is valuable not only because of the approval of the doctrine announced in *Muscoe's Case*, but because it shows the high regard for the personal liberty of the citizen, even though a "suspicious character."

[6] In *Bourne* v. *Richardson*, 133 Va. 441, 113 S. E. 893, Bourne was a policeman of the city of Radford, and Richardson, a well known character there, had the reputation of being a "bootlegger," and had previously been convicted of violating the prohibition law. A warrant for the arrest of Richardson for another violation of the prohibition law had been issued but not executed. This warrant, which made no reference to the prior conviction and charged merely a misdemeanor, was placed in the hands of another officer. Bourne knew of the foregoing facts, but had never seen the warrant and did not know its precise purport. While the warrant was addressed to another officer, it might have been executed by Bourne if it had been delivered to him for that purpose. Code, section 6055. While Richardson was peaceably walking down one of the streets of the city of Radford, he met Bourne, and the following is Richardson's

account of what took place: "I was going down the street, met Mr. Bourne, we happened to meet up together. 'Mr. Richardson,' he says: 'I will have to arrest you.' I says: 'You are fooling ain't you, Pat?' He says: 'No, I am not fooling.' I says: 'Where is your warrant?' He says: 'I don't have to have any.' I says: 'What's the charges?' He says: 'Don't have to have any.' At this time Bourne grabbed me right there and drew his pistol with the other hand. I says: 'You got no warrant and I am not going with you,' and pushed off from him and got away from him. Then he shot four or five shots at me and the last shot he shot me; and I was twenty feet, maybe a little more or a little less, the first shot that he shot at me."

Richardson sued Bourne for unlawfully and maliciously shooting him and recovered a judgment for $3,000.00, which was affirmed by this court. The chief defense of Bourne was that a second offense under the prohibition law was a felony and that he had reasonable ground to believe that Richardson had committed a felony and hence had the right to arrest without a warrant. He also defended on the ground that he had a right to arrest for a misdemeanor founded on the warrant in the hands of another officer. The *Muscoe Case* was not referred to on this point, but it is manifest that the court had it in mind. It is said in the opinion "the outstanding difficulty in the way of the defendant in this case was the fact that he was not armed with a warrant." If, as contended by Bourne, he was making the arrest because Richardson was drunk and disorderly, or was in good faith believed to have been guilty of a felony, no warrant was necessary. But the jury did not credit this view and found against Bourne. The decision meant, and could only mean, that Bourne had no power to make an arrest for a past misdemeanor unless

he had the warrant therefor with him.    The facts of that case are so similar to the facts of the instant case that the judgment of the trial court cannot be reversed on this point without overruling *Bourne* v. *Richardson*, which we are not inclined to do.

If the powers of officers are deemed too restricted, the remedy is with the legislature.

[7] It is assigned as error that the trial court refused to permit the defendant to introduce, in mitigation of damages, "the conduct and language of the plaintiff which caused the criminal warrant to be issued for her arrest." In this there was no error. The arresting officers had nothing to do with what transpired before the warrant was issued. The warrant of arrest was their only mandate; what transpired before its issue was *res inter alios acta* and no concern of theirs. Their duty was independent of the guilt or innocence of the accused. With this they were not concerned.

[8] The plaintiff was served with a warrant charging her with resisting an officer, and was fined $10.00. She was also tried on the original warrant under which the arrest was made and fined $50.00. The defendant offered in evidence those warrants and the judgments thereon to show the good faith of the officers and also in mitigation of damages. The trial court admitted in evidence the warrant for the arrest of the plaintiff, but refused to admit the judgment on that warrant, or the warrant and judgment in the case for resisting an officer. This ruling of the trial court is assigned as error.

The instant action was for the illegal arrest and for the assault committed at that time, and it is manifest that the rejected evidence of what took place after that time was not admissible to bar recovery. But it is insisted that it was admissible to show the good faith of the officers and in mitigation of damages. This might

be true if damages were claimed for anything that transpired after the time of the arrest, or if punitive damages were claimed, but no such damages were claimed. The plaintiff was promptly bailed and nothing took place thereafter for which she could claim damages. What she claimed was compensation for the physical and mental pain and suffering endured by her in consequence of the conduct of the officers at the time of her arrest. The instructions asked by the plaintiff and given by the court, said nothing about punitive damages. On the contrary, they told the jury that, if they found for the plaintiff, their verdict should be "in such sum as the evidence shows the said plaintiff has sustained damages, but not to exceed the sum of $5,000.00."

[9] The defendants were sued for a wrongful arrest and detention under very aggravating circumstances. Neither malice, ill will, nor the slightest wrongful intention on the part of the defendants is necessary to maintain the action. Note, 67 Am. St. Rep. 408, and cases cited. Good faith on the part of one making a wrongful arrest is no answer to a claim for the actual damages sustained in consequence thereof. "Evidence of the defendant's good faith, and of his having reasonable grounds to believe the prosecution valid and just, is admissible to rebut the claim of vindictive damages, but not to reduce the verdict below the actual damage suffered." 11 R. C. L. 821, section 36; 25 C. J. 561.

The cases relied on by the plaintiff in error do not sustain his claim that the evidence tendered, but excluded, was admissible where the claim was for compensatory damages only.

In *Beckwith* v. *Bean*, 98 U. S. 266, 25 L. Ed. 124, the plaintiff sought to recover "exemplary or vindictive damages, by way of punishment," and there was a verdict for $15,000.00 damages, but it was admitted in the

majority opinion that the jury may "when legal justification is not shown, consider the direct expenses incurred by the injured party, his loss of time, his bodily sufferings, under some circumstances his mental agony, his loss of reputation, the degree of indignity involved in the wrong done, and the consequent public disgrace attending the injury. These and similar elements of injury may be made the basis of compensation, and *such compensation cannot be diminished by reason of good motives upon the part of the wrong doer.*" (Italics supplied.)

In *Thompkins* v. *Mo., etc., R. Co.*, 211 Fed. 395, 396, 128 C. C. A. 1, 52 L. R. A. (N. S.) 791, the plaintiff claimed not only actual damages, but $25,000.00 punitive damages. Furthermore, in that case there was conflict as to what charges had been brought against the plaintiff, and the court said: "What the actual charge against him was, was an issue on which he had testified, and the record of the justice, the complaint, the warrant, and the testimony of the other witnesses who knew, were admissible to contradict his testimony, and to disclose all the facts relating to the proceedings before the justice."

In *Nelson* v. *Snoyenbos*, 155 Wis. 590, 145 N. W. 179, both compensatory and punitive damages were claimed, and were allowed by the jury. A new trial was awarded because of the exclusion of certain evidence. A verdict for compensatory damages had been directed by the trial court in favor of the plaintiff. Of this direction, the appellate court said: "A verdict was, of course, properly directed, because the conduct of the defendant was in violation of law."

As the plaintiff only sought to recover the actual damages sustained in consequence of the wrongful and illegal act of the defendant, the trial court committed no error in excluding the evidence referred to.

[10] During the closing argument counsel for the

plaintiff said to the jury: "What would you have your wife treated that way for?" Counsel for the defendant asked the trial court to "disregard the same as improper argument, but the court refused to do so," and the defendant excepted. This action of the trial court is now assigned as error.

This character of argument was condemned in *P. Lorillard Co.* v. *Clay*, 127 Va. 734, 752, 104 S. E. 384. The request of counsel for the defendant should have been granted, but the statement seems to have been rather a casual remark than a deliberate argument, couched in a single sentence of a few words, and the amount of the verdict does not indicate that it seriously affected the result. Standing alone, it is not of sufficient importance to justify a reversal, and will be treated as harmless.

[11] In view of the testimony for the plaintiff, the verdict cannot be said to be excessive. Whether or not the satisfaction of one of the judgments will be a satisfaction of both is not before us for consideration.

Upon the whole, we are of opinion to affirm the judgment of the trial court in each of the cases.

*Affirmed.*